AGNES CONNORS *vs.* BOSTON ELEVATED RAILWAY COMPANY.

Suffolk.   March 25, 26, 1914.—May 22, 1914.

Present: RUGG, C. J., HAMMOND, LORING, SHELDON, & CROSBY, JJ.

*Negligence,* Employer's liability, Elevated railway.

At the trial of an action under St. 1909, c. 514, § 127, cl. 3; § 129, against an elevated railway company for causing the death of a workman of the defendant who was run over by an elevated train while he with others was engaged in work upon the defendant's apparatus on the elevated tracks, where the declaration alleged that the death was caused by negligence of a motorman of the elevated train in failing to warn the workman of the train's approach and in running the train at a reckless and excessive rate of speed, there was evidence tending to show that during the progress of the work it was necessary for the workmen to leave the work and cross a track to a platform every time a train passed on that track, that trains sometimes passed as often as every three minutes, that for about five weeks while the work was going on the custom had been for a foreman, or, in his absence, one of the workmen, to proceed along the track to a point at least one hundred and fifty feet away, where trains approaching at a distance of seven hundred feet could be seen, and to blow a whistle when a train came, and that no one ever before had failed to get out of the way when the whistle was blown; that on the occasion in question a fellow workman gave such a warning of the approaching train, that all the other workmen left the track in ample time but that the plaintiff's decedent for some reason unexplained by the evidence remained sitting on the rail with his back to the train; that, as or just before the train passed him, the man who had signalled motioned to the motorman, intending to warn him, but instead gave the trainman's signal that meant "go ahead," that the train then was going twenty miles an hour and immediately slowed down and pushed against the decedent, causing him to fall from the track to the street and to be instantly killed.   *Held,* that there was no evidence of negligence on the part of the motorman.

Twenty miles an hour is not a reckless or excessive rate of speed for the running of an elevated train around curves under ordinary conditions.

TORT, originally by Francis T. Leahy, administrator of the estate of Patrick J. Connors, the writ and declaration afterwards being amended, as stated in the opinion, so that the action was

by the mother and sole next of kin of Connors to recover under St. 1909, c. 514, § 127, cl. 3; § 129, for his death while in the defendant's employ. Writ dated January 21, 1911.

In the Superior Court the case was tried before *Keating*, J. There were but two witnesses, the plaintiff and one Shambler. The evidence is described in the opinion. At the close of the plaintiff's evidence, the defendant rested and asked that a verdict be ordered in its favor. The request was refused. There was a verdict for the plaintiff in the sum of $1,500; and the defendant alleged exceptions.

*F. M. Ives*, for the defendant.

*F. T. Leahy*, for the plaintiff.

CROSBY, J. This action originally was brought by the administrator of the estate of Patrick J. Connors to recover for his conscious suffering and death. Afterwards, by amendment, Agnes Connors, mother of the intestate and his sole next of kin, was substituted as the plaintiff. The amended declaration contained five counts. At the trial the plaintiff waived the first, second and fourth counts, the presiding judge directed a verdict for the defendant upon the fifth count, and the case was submitted to the jury on the third count, which was for the death of the decedent alleged to have been caused by the negligence of the motorman of an elevated train, under St. 1909, c. 514, § 127, cl. 3. The decedent Connors was instantly killed, and his mother as dependent next of kin seeks to recover under the third count. St. 1909, c. 514, § 129.

For five or six weeks before September 15, 1910, the date on which Connors was killed, he and three other men, together with a foreman named Martin, had been in the employ of the defendant, painting the compressed air pipe which extended outside the guard rail of the south bound track on the elevated structure between the North Station and Northampton Street in Boston. As the compressed air pipe was outside the guard rail for the south bound track, the men while at work were obliged to get up and cross the track to the platform which extended between the north bound and south bound tracks whenever a train passed, as there was no room for them to stand on the outside of the elevated structure. One of the men employed at this work, John H. Shambler, who was the only witness to the accident that

was called, testified in part: "During these five or six weeks preceding the day of the accident, it had been the custom for Martin, the foreman, or if Martin had business elsewhere, for one of the four remaining men, to proceed a distance of from one hundred and fifty to two hundred and fifty feet to the north of the place where the men were working, with a shrill whistle, known as a derrick whistle. Upon the approach of a train the man with the whistle would blow upon it as a signal to the men who were working in the path of an oncoming train that the train was coming and they were to get up and out of the way. When Martin was there, Martin always blew the whistle. When he was not there he would give it to some one of the other four, and at times the deceased had been the man who blew the whistle to warn the others to get out of the way." The witness Shambler, at the time of the accident and for about two hours previously, had been in charge of the whistle. Shambler testified that just before the accident he was standing between the rails so that he could see trains coming from the direction of the North Station, a distance of about seven hundred feet, and could see the men at the same time. The evidence showed that there was a curve in the track as trains approached the place where the men were at work; that the distance from the place where Shambler stood to the place where the men were working was from one hundred and fifty to two hundred feet, and that Connors was farthest to the south. Shambler testified that when the train which struck Connors was from two hundred to five hundred feet away from him, he (Shambler) blew his whistle three or four times and then went upon the platform; that when he was on the platform he noticed that the two men nearest to him had crossed the track to the platform, but that Connors was still sitting on the guard rail with his back to the approaching train, "in the usual position he took when working, but did not appear to be moving." This witness further testified that when the train was "pretty near abreast" of him, he motioned to the motorman to blow his whistle. On cross-examination he testified that he gave this signal when the train was about sixty or seventy feet from him; that he could not say whether the motorman blew his whistle or not; that the train was running at the rate of about twenty miles an hour, and did not begin to slow down until after it had passed the witness.

The evidence showed that the train slowed down, but struck Connors, who did not move, and pushed him along a short distance, when he fell to the street below. Shambler also testified that since the accident he had learned that the signal he gave to the motorman to blow his whistle was really a motion which in railroad signalling meant "All right. Go ahead."

The third count, upon which the case was submitted to the jury, alleges, and the plaintiff contends, that the negligence of the motorman consisted (1) in a failure to warn the deceased of the approach of the train; and (2) in running the train at a reckless and excessive rate of speed. The undisputed evidence shows that during the five or six weeks before the accident, while the men had been engaged at this work, from one hundred to one hundred and fifty trains a day passed; that at times they came only two or three minutes apart, so that the men had hardly got back to work when they were obliged to get up again and go to a place of safety; that no one ever had failed before to get out of the way when the whistle was blown. Shambler further testified that on going to work on the morning of the accident Connors told him that he (Connors) had been up all night at a party the night before.

We are unable to perceive any negligence of the motorman. The arrangement which had been adopted for warning the men by blowing the whistle clearly indicated that motormen were not expected to stop or slacken the speed of trains on account of these workmen on the track. It is apparent that neither the motormen nor the workmen expected that the former should look out for the latter. The means adopted to protect the men by the warning whistle appears to have been adequate during the five or six weeks preceding the time of the accident, and was sufficient on that occasion as to all the men except the decedent Connors. The two men working with him, although nearer to the approaching train, went upon the platform when the whistle was sounded. For some unexplained reason Connors did not move. Why he continued to remain in a place of extreme peril is difficult to understand. It would seem that with the noise of the approaching train and the signal given by Shambler, he would have heard it as did his fellow workmen, if he was awake and in possession of his faculties; it may be that he was asleep and did not hear

the warning. If so, it would explain his failure to leave the track and go upon the platform. In view of the evidence, his condition just before the accident is largely a matter of conjecture. *Stewart* v. *New York, New Haven, & Hartford Railroad,* 206 Mass. 268. The motorman had no reason to suppose that the decedent would remain on the track. If it was his duty to blow the whistle as the train passed Shambler, there is no evidence to show that he did not do so. Shambler testified that at the time he signalled the motorman to blow the whistle Connors still had time to get up and reach a place of safety before he was struck. The evidence shows that the train slowed down, but did not stop in time to avoid striking Connors. As the motorman was not expected to stop or slacken the speed of his train for the men, we are unable to discover any negligence on his part. As he came around the curve he could have seen Shambler and could properly assume that the latter was protecting the men at work upon the track. When it appeared that the decedent did not move and was in danger of being struck, there is no evidence to show that the motorman did not do all in his power to stop his train and avoid the accident.

The plaintiff contends that the motorman was negligent in running his train around the curve at the rate of twenty miles an hour. It does not seem to us that twenty miles an hour is a reckless and excessive rate of speed to run a train on an elevated railway, under ordinary conditions. The elevated structure, including its tracks, is in the exclusive occupation and control of the defendant, and is not like the track of a surface car, where the motorman is bound to regard the equal rights of other travellers upon the highway, who may be travelling on foot, or in carriages, automobiles or other vehicles. Elevated railways are constructed and maintained largely to meet the demand of the public for rapid transit. The fact that this train was running around a curve at the rate of twenty miles an hour does not seem to be reckless or excessive. It is a matter of common knowledge that the tracks upon the elevated structure, in order to pass through the public streets for the accommodation of the great volume of travel in different sections where its lines are constructed, must of necessity contain many curves throughout its entire system.

In considering the question of the duty of the defendant toward the plaintiff's intestate, the language of the present Chief Justice of this court, in *Devine* v. *New York, New Haven, & Hartford Railroad*, 205 Mass. 416, 419, would seem to be applicable here: "The plaintiff's intestate was working in a highly dangerous place, over which the defendant's servants were obliged to run its trains in the performance of its duties to the public. The evidence all shows that the employees of the city were expected to, and in fact did, except on this single occasion, look out for their own safety. There is nothing to indicate that there was any duty on the part of the defendant's employees to ring the bell at that place, or that, in view of all the noise in the neighborhood, anybody could or did rely upon warning from that source." See also *June* v. *Boston & Albany Railroad*, 153 Mass. 79.

The evidence fails to disclose any negligence on the part of the defendant's motorman, so that the questions, whether there was any evidence of due care on the part of the plaintiff's intestate, and whether the plaintiff was dependent upon the decedent within the meaning of St. 1909, c. 514, § 129, become immaterial.

The exceptions must be sustained, and judgment should be entered for the defendant in accordance with St. 1909, c. 236.

*So ordered.*